J-S18017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.T.-B., MOTHER | : | No. 473 EDA 2021 |

Appeal from the Order Entered January 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000377-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.T.-S., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.T.-B., MOTHER | : | No. 474 EDA 2021 |

Appeal from the Decree Entered January 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000479-2020

BEFORE:   PANELLA, P.J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED AUGUST 6, 2021**

In these consolidated appeals concerning J.S. (Child), born in February of 2019, K.T.-B. (Mother) appeals from: (1) the decree entered in the Philadelphia County Court of Common Pleas, terminating her parental rights to the Child; and (2) the order, entered the same day, changing the Child's placement goal to adoption.[1]  After careful review, we affirm.

───────────────────────────

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court *sua sponte* consolidated Mother's two appeals.  We note the trial court also terminated, on the same day, the parental rights of J.S. (Father), Child's father.  Father has not filed an appeal.

## I. Facts & Procedural History

The trial court summarized the factual history concerning Mother's own dependency, her mental health, and the birth of Child:

[The Philadelphia Department of Human Services (DHS)] became involved with this family on September 18, 2018, when Mother was adjudicated dependent and placed in DHS custody. On October 29, 2018, Mother was placed at Northern Children Services Generations One maternity group home ("Northern"), where she gave birth to Child [in February of 2019.[2] . . . ].

\* \* \*

Mother has several mental health diagnoses, including unspecified bipolar disorder, oppositional defiant disorder, unspecified intellectual disability, and unspecified schizophrenia spectrum and other psychotic disorder[s], along with a history of emotional instability and erratic behavior. Mother was found to be at a 7th grade reading level when testing for Intellectual or Development[al] Disabilities ("IDD"). . . .

Trial Ct. Op., 3/24/21, at 1-2 (paragraph break added).

The trial court also summarized the general protective services (GPS) report made within weeks of Child's birth:

[O]n February 22, 2019, DHS received a [GPS] report alleging[: (1) Mother would leave Child unattended with a bottle propped in his mouth and continued this behavior after being counseled against such[; and (2)] Mother had a history of becoming verbally aggressive with the staff at Northern and leaving without disclosing her intended location. . . .

. . . The GPS report indicated concern for Child's safety and well-being when in Mother's care due to a need for constant childcare counseling, staff monitoring every fifteen minutes, Mother not

_____

[2] Mother was 17 years old when she was declared dependent, and when she gave birth to Child.

- 2 -

participating in parenting classes or therapy, Paternal Grandmother's home being inappropriate, Child's Father[ ] being in delinquent placement . . . and a belief that Mother needed a higher level of care than Northern could provide. This report was determined to be valid.

On February 23, 2019, DHS received a supplemental report alleging: Mother enrolled in learning support classes at Roxborough High School; Mother may not be able to care for Child on her own; Mother did not have a good relationship with Maternal Grandmother; Mother continued problematic or dangerous behavior with Child despite repeated counseling; and Mother would appear easily frustrated when Child cried. DHS received another supplemental report on February 25, 2019, alleging Mother had been prescribed Haldol and received counseling at Northern.

Trial Court Op. at 1-2.

The trial court also set forth the factual history precipitating DHS'

dependency petition:

In early February 2019, [the same month in which Child was born,] Mother attempted to stab another resident [at Northern] with a steak knife. Police were called . . . .

DHS conducted a visit to Northern on March 1, 2019, and observed Mother feeding Child with a bottle . . . on his back, a practice Mother admitted to using regularly. DHS observed Mother become defensive when counseled about safe and appropriate care for Child. DHS learned Mother refused medication, and on or about February 27, 2019, threatened to kill herself and Northern staff if Child was removed from her care. Mother was subsequently evaluated at Philadelphia Children's Crisis Response Center . . . and was involuntarily committed for psychiatric treatment.

On March 1, 2019, [when Child was three weeks old,] DHS obtained an Order of Protective Custody ("OPC") and Child was placed in foster care . . . . At the March 4, 2019, shelter care hearing, the trial court lifted the OPC and ordered the temporary DHS commitment stand.

Trial Ct. Op. at 2.

On March 8, 2019, when Child was approximately one month old, DHS filed a dependency petition.

> Community Umbrella Agency ("CUA") Tabor Community Partners held a Single Case Plan ("SCP") meeting on March 27, 2019. Child's primary goal was reunification, with adoption as a concurrent goal. Mother's objectives were to make herself available and comply with CUA services, comply with Child visitation, follow all mental health treatment recommendations, comply with medication management, participate in parenting classes, and comply with all court orders.

> Around July 5, 2019, DHS learned Mother had attended three of nine scheduled visits with Child. On July 9, 2019, . . . Child was adjudicated dependent[ and] was fully committed to DHS custody. The trial court ordered Mother be referred to the Achieving Reunification Center ("ARC") for parenting services, Mother and Father be referred for domestic violence counseling and the Clinical Evaluation Unit ("CEU") for forthwith drug and alcohol screens, dual diagnosis assessment, and three random drug screens prior to the next court date on September 13, 2019.

Trial Ct. Op. at 3 (footnote omitted.)

> Around September 11, 2019, DHS learned Mother had attended none of the five visits offered with Child. Mother was engaging in parenting classes. Her current address was unknown as she no longer resided with Maternal Grandmother. Mother and Father had been involved in multiple physical altercations since the July court date and neither had engaged in domestic violence services. Paternal Grandmother has also been involved in multiple physical altercations with Mother, harassed and used threatening language against Mother.

> On September 13, 2019, the trial court held a permanency review hearing for Child. Mother was present for this hearing. [She was again referred to drug and alcohol screening, ARC, and parenting classes.] A stay-away order[ ] was issued . . . against Paternal Grandmother . . . to have no contact with Mother and have no visits with Child.

- 4 -

The [plan] was revised on October 1, 2019. Child's primary goal remained reunification[ and his] concurrent goal . . . adoption. [In addition to the above plan goals, Mother was directed to] provide proof of housing and employment, and allow CUA to assess her home.

Around December 3, 2019, DHS learned Mother was visiting Child since October 15, 2019; however, [she] was inconsistent with her parenting classes and ARC services. Mother had also enrolled at Roxborough High School and was four credits from earning her high school diploma.

[Meanwhile,] Mother had tested positive for marijuana on September 23, 2019, and amphetamines on October 21, 2019. While Mother was referred for substance abuse treatment through NorthEast Treatment Centers . . . she did not attend her intake appointment.

Trial Ct. Op. at 3-4.

The trial court described the subsequent proceedings and permanency review hearings in Child's dependency case:

On December 5, 2019, the trial court held a permanency review hearing[.] Mother was found minimally compliant with her permanency plan, inconsistent in her parenting class attendance, and had only visited with Child four times since the September 2019 hearing. . . . Mother was ordered to engage in substance abuse treatment and participate in a dual diagnosis program and provide her current address to her CUA Case Manager. . . .

As of February 11, 2020, DHS learned Mother remained consistent in visitation, completed housing services through ARC, and engaged in parenting services through the Achieving Independence Center ("AIC"). Mother was also referred for a PCE ("Parenting Capacity Evaluation") and Intellectual Disability Services ("IDS"). On February 13, 2020, the CEU Case Manager provided DHS with a progress report stating Mother tested negative for all illicit substances on January 2 [and] 6, 2020, but failed to schedule and attend a third random assessment.

On February 13, 2020, the trial court held a permanency review hearing for Child. Mother was present for this hearing.

- 5 -

. . . Mother was referred to Serenity Safe Haven Outpatient Clinic ("Serenity") for monitoring and to CEU for three random drug tests prior to the next court date[.]  Mother was also ordered to provide proof of employment and housing.  The stay-away order against Paternal Grandmother remained.  Mother's visitation with Child was set at weekly supervised visits at [DHS] for two hours.

Trial Ct. Op. at 4-5.

The trial court set forth additional factual and procedural background regarding Child's dependency case as follows:

On September 8, 2020, DHS learned Mother had attended five of 16 required parenting classes prior to the COVID-19 pandemic and had not re-engaged in virtual parenting classes. Mother was inconsistent with her mental health and substance abuse treatment.  The CUA Case Manager would periodically lose contact with Mother due to Mother's losing her cell phone and lack of stable and appropriate housing.  Mother had attended 23 of the 50 offered visits since the last court date in February.  Mother was not confirming her visits.  Mother lacked the knowledge of how to appropriately care for Child; therefore, [she] was previously referred for a PCE.  DHS also learned that Father had physically assaulted Mother on multiple occasions, used threatening language against her, and had not visited Child in over a year to establish a bond with Child.

The [plan] was once again revised on October 2, 2020. Child's goals remained the same.  Mother's objectives [also generally remained the same, and she was directed to] file for a Protection from Abuse ("PFA") against Father. . . . .  DHS learned on October 5, 2020, that Mother had begun in-person visits with Child, but did not appear able to care for Child appropriately.

On October 7, 2020, the trial court held a permanency review hearing.  . . .  The trial court found Mother minimally compliant with her permanency plan, with minimal progress made with respect to alleviating the circumstances requiring Child's placement.  [A plan meeting] was ordered to assess the appropriate goal for Child.  Father was to have no-contact with Mother and Mother was ordered to seek a PFA order against Father.  Mother was referred for [drug screenings and] a Healthy Relationship program.  . . .  The CUA Case Manager was to refer

- 6 -

Mother for a Philadelphia Health Management Corporation ("PHMC") grant once she obtained appropriate housing. The stay-away order against Paternal Grandmother stood. Mother would have weekly supervised visits with Child at [DHS] and needed to confirm her visits 24 hours in advance and on the day of the visit.

On December 10, 2020, Mother underwent a [parenting capacity evaluation], conducted by William Russell, PhD. Dr. Russell reported Mother was unable to provide a safe environment for Child at that time, did not have appropriate housing or income, had minimal family/social support, and had extensive mental health history impacting her ability to parent. Recommendations were for Mother to complete her [plan] objectives.

Trial Ct. Op. at 5-6.

Where Child had been in DHS care since March 1, 2019, when he was three weeks old, on December 28, 2020, DHS filed petitions to change the goal to adoption, and to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The trial court appointed Lisa Visco, Esquire, as Child's guardian *ad litem* and legal counsel ("GAL/Counsel").[3]

_____

[3] Child was two years old at the time of the termination hearing. The GAL/Counsel stated that there is no conflict in representing both the best interests and being legal counsel. N.T. 1/22/21, at 16. ***See In re Adoption of L.B.M.***, 161 A.3d 172, 174 (Pa. 2017) (plurality) (23 Pa.C.S. § 2313(a) mandates appointment of counsel for children involved in contested involuntary termination of parental rights proceedings). ***See also In re T.S.***, 192 A.3d 1080, 1092 (Pa. 2018) (trial court did not err in allowing the children's guardian *ad litem* to act as their sole representative in termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome).

The GAL/Counsel has filed a brief in support of terminating Mother's parental rights. ***See In re: Adoption of K.M.G.***, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (while this Court has authority to raise *sua sponte* issue of whether the trial court appointed any counsel for the child, but not
*(Footnote Continued Next Page)*

On January 22, 2021, the trial court held an evidentiary hearing on the goal change and termination petitions. We note that at this time, Child was almost two years old, and had been dependent since he was approximately one month old. Mother participated *via* videoconference and was represented by counsel. Father did not attend but was represented by counsel. The GAL/Counsel was present on behalf of Child. DHS presented the testimony of Summer Mills, CUA Case Manager, and Dr. William Russell. Mother testified on her own behalf. On the same day, the trial court entered an order changing Child's permanent placement goal to adoption and a decree involuntarily terminating Mother's parental rights to Child.

On February 17, 2021, Mother timely filed separate notices of appeal from the termination decree and goal change order, along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal. On April 1, 2021, this Court *sua sponte* consolidated her appeals.

Mother raises the following claims for our review:

1. Did the [trial court] err in finding that [DHS] had met its burden in proving grounds under 23 Pa.C.S.A. §[ ] 2511(a)(2), (5), and (8)?

2. Did the [trial court] err in finding that DHS had met its burden to prove that termination would be in the child's best interests, under § 2511(b)?

_____

the authority to *sua sponte* review "whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding"), *aff'd* 240 A.3d 1218 (Pa. 2020).

3. Did the [trial court] err when it found that DHS by clear and convincing evidence had met its burden to change child's goal to adoption?

4. Did the [trial court] err in failing to make a finding as to "reasonable efforts", and specifically as to assistance with Mother's [intellectual or developmental disabilities] challenges?

Mother's Brief at 5.

## II. Termination Under Subsection § 2511(a)

First, Mother asserts the trial court erred in finding DHS established by clear and convincing evidence grounds to terminate her parental rights under Susbsection 2511(a)(2), (5), and (8). Specifically, Mother argues she did **initiate** efforts to remedy the conditions that led to the termination petition, and she **made progress** with her objectives. In support, she maintains she was consistent in her visitation, completed housing services through ARC, engaged in parenting services through AIC, tested negative for drug use on January 2 and 6, 2020, and obtained employment. With respect to **completing** her objectives, she reasons that where the termination petition was filed on December 28, 2020, and the hearing was held on January 22, 2021, she had "at most 25 days to" complete her efforts. Mother's Brief at 13. Mother also contends DHS failed to make reasonable efforts to assist her with the challenges presented by her intellectual or developmental disability. We conclude no relief is due.

We note the relevant standard of review:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence

presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. Ct. 2007) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b)[.]

*In re L.M.*, 923 A.2d at 511 (citations omitted).

In the present case, the trial court terminated Mother's parental rights pursuant to Subsections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a) to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the trial court's decision to terminate pursuant to Subsection 2511(a)(2), which provides as follows:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

- 10 -

necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). This Court has stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the trial court discussed its decision to terminate Mother's parental rights pursuant to Section 2511(a)(2):

Child has been involved with DHS since February 2019 and committed to DHS custody since March 1, 2019, less than one month after his birth[.] Mother's [plan] objectives throughout the life of the case were to: make herself available for and comply with CUA services; comply with visitation; follow all mental health treatment recommendations; comply with medication management; participate in parenting classes; comply with all court orders; obtain stable and appropriate housing, provide proof, and allow the CUA Case Manager to assess [her] home; obtain stable employment and provide proof; engage in dual diagnosis treatment and follow all recommendations, including availing for drug screens; comply with a PCE referral; comply with ARC services to accomplish her objectives; and file a PFA against

- 11 -

Father. Mother participated in [plan] meetings and was aware of her objectives.

Trial Ct. Op. at 9 (record citations omitted).

With respect to Mother's mental health, the trial court found: "Mother's mental health crisis was a determinant factor in committing Child to DHS custody in March 2020 and she has not taken satisfactory action to ensure her mental health will not cause repeated and continued incapacity, resulting in Child being without essential care." Trial Ct. Op. at 10. The court explained in detail:

> Mother has diagnoses of bipolar disorder, oppositional defiant disorder, schizophrenia, and intellectual developmental disabilities. Dr. William Russell,[4, who performed Mother's parenting capacity evaluation, testified that she] has been prescribed Haldol, Depakote, and Abilify for her mental health disorders, although her medication management has been inconsistent with a history of noncompliance. Mother had been refusing medication while at Northern early in the life of the case, and explicitly reported noncompliance on December 2020. Mother has also been involuntarily psychiatrically hospitalized and ordered to engage in therapeutic treatment services, for which she also has a history of noncompliance. Records reviewed by Dr. Russell . . . indicated Mother has had ongoing psychiatric treatment since 2004, but with a pattern of inconsistency and noncompliance. After threatening to kill herself and staff at Northern, Mother was involuntarily hospitalized at Belmont Hospital and would repeatedly [go] AWOL from the facility.
>
> Mother was also receiving counseling and substance abuse treatment at Serenity for over a year; however, Mother's attendance was inconsistent, and she reportedly came on days no

_____

4 Here, the trial court noted a typographical error in the January 22, 2021, notes of testimony. The testimony at pages 16 to 45 is attributed to "Ms. Mills," where the witness was in fact Dr. Russell. Trial Ct. Op. at 9 n.4.

appointment was scheduled and would frequently state she no longer needed therapy; between October . . . and December 2020, Mother attended therapy at Serenity only three times. Mother did not consistently comply with her objective to obtain dual diagnosis treatment and was consistently found noncompliant throughout the life of the case. Mother's explanation for her inconsistency and noncompliance with mental health treatment is that she believes there is nothing "wrong with her" and she's "cool. [She] don't [sic] need it." [N.T. 1/22/21, at 54.] Mother has failed to appropriately engage in her mental health objective due to inconsistent attendance at therapy and noncompliance with medication management. Mother was aware of her mental health objective. . . .

Trial Ct. Op. at 9-10 (some record citations omitted and paragraph break added).

With respect to Mother's plan objectives concerning housing, parenting capacity evaluation, parenting classes, and visitation, the trial court found as follows:

Mother also has unstable housing. [N.T. at 23, 40, 95.]. Prior to the termination hearing, Mother had been residing . . . in placement at Northern. At the time of the termination hearing in January of 2021, Mother resided with Maternal Grandmother, but Dr. William Russell noted how their history had been volatile with frequent fights . . . that had previously caused Mother to be placed outside Maternal Grandmother's home. [N.T. at 40.] The CUA Case Manager stated housing with Maternal Grandmother is not appropriate and that[,] despite multiple conversations with Mother about her housing objective and options, Mother only expressed interest in non-viable housing options. [N.T. at 62-65.] Mother was aware of her housing objective and remained noncompliant. [N.T. at 64, 95.] Mother was referred to ARC to attend the housing, employment, and parenting programs.

Trial Ct. Op. at 10.

The trial court found the following with respect to Mother's parenting abilities:

Mother completed her [parenting capacity] evaluation. Dr. William Russell provided a professional opinion that Mother is unable to provide safety for Child. Dr. Russell recommended that Mother must successfully complete a parenting program and family school, and engage in long-term therapy and medication management. [N.T. at 30-35.] Parenting classes had remained an objective for Mother throughout the life of the case, and Mother was inconsistent in her compliance. [N.T. at 53, 64-65.] Mother initially attended parenting classes through Tabor, then she was referred to ARC. Due to the COVID-19 pandemic, the parenting classes became virtual; however, Mother inconsistently attended classes. At the time of the termination trial, Mother had not successfully completed her parenting program objective. [N.T. at 65-66.] Mother does not have adequate understanding of Child's developmental needs and could not have unsupervised visits with Child throughout the case. [N.T. at 67.] Mother was also minimally compliant with visitation. Mother has been inconsistent with her visitation with Child throughout the life of the case. Mother frequently would not attend, come late, or not confirm the visit. [N.T. at 66.] Mother never graduated beyond supervised visits at [DHS] with Child. [N.T. at 67.]

Mother's behavior during visitations remained problematic. DHS originally became involved in the case in part due to Mother's unsafe feeding practices. This behavior continued through supervised visits, where Mother would attempt to feed Child cookies despite him not having enough teeth and when instructed to engage with Child in a safer and more appropriate manner, Mother laughed. [N.T. at 67.] While Mother shows affection towards Child, she becomes easily upset and irritated if Child cries or screams and is unable to calm Child. [N.T. at 66-67.] Mother and Child needed to be monitored every 15 minutes while at Northern, and Mother has failed to learn safe parenting practices. Mother never successfully completed a parenting program and was inconsistent in attending her supervised visits. **Mother is unable to provide a safe environment for Child and has refused to remedy the issues causing Child to be without essential care.** [N.T. at 68, 95].

Trial Ct. Op. at 11 (some record citations omitted and emphasis and paragraph break added).

The trial court, therefore, found the following with respect to section 2511(a)(2):

> Overall and throughout the life of the case, Mother has been minimally compliant with her [plan] objectives[ and] has failed to successfully complete most of her critical [plan] objectives, such as her mental health treatment, obtaining stable and appropriate housing, participating in a dual diagnosis program, and successfully completing a parenting program. [N.T. at 22-26, 40-41, 62-64, 95.] The CUA Case Manager believes Mother does not have adequate understanding of Child's developmental needs. [N.T. at 67.] **The conditions and causes of Mother's incapacity cannot or will not be remedied by Mother.** Child was adjudicated dependent on March 4, 2019. Child had been in DHS care for twenty-two months at the time of the termination trial on January 22, 2021. Mother has attended almost all the court hearings and is aware of her [plan] objectives. Mother had ample opportunity to put herself in a position to adequately parent and care for Child, but **her repeated and continued incapacity has not been mitigated.** Mother is unable to meet Child's basic needs due to her lack of adequate understanding of parenting and child developmental needs. [N.T. at 67.] The testimony of Dr. William Russell and the CUA Case Manager was credible. Mother has demonstrated an unwillingness to acknowledge or remedy the causes of her incapacity to parent in order to provide Child with essential parental care, control, or subsistence necessary for his physical and mental well-being. Termination under 23 Pa.C.S.[ ] § 2511(a)(2) was proper.

Trial Ct. Op. at 8-12 (emphases added).

Our review of the record supports the trial court's conclusions. The trial court credited Ms. Mills' testimony that Mother's compliance with her plan was minimal. *See* N.T. at 68. Dr. Russell opined that Mother did not have the capacity to provide safety and permanency for Child based on her lengthy history of mental health issues and her noncompliance and inconsistency with treatment and medication. *Id.* at 22-23. Dr. Russell also expressed concern

for Mother's lack of income and appropriate housing, as well as minimal community or family support. *Id.* Dr. Russell emphasized that "[t]he more support you have, the better off you're going to be, especially in this situation, because we have a very young girl who, because of the toll from this developmental history, is immature and is having a difficult time navigating this." *Id.* at 36.

The record supports the trial court's finding that Mother is incapable of providing Child with proper parental care, and that she cannot or will not remedy her parental incapacity. Child has been in care since March 4, 2019, 22 months at the time of the termination hearing on January 22, 2021. N.T. at 9-10. Despite almost two years of opportunities, Mother made only minimal progress toward compliance with her goals. Child is in need of a permanent and stable home, and his life cannot remain on hold forever. *See In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Therefore, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(2). *See In re L.M.*, 923 A.2d at 511.

## III.  Termination Under Subsection 2511(b)

In her second issue, Mother alleges DHS failed to present sufficient evidence, pursuant to Subsection 2511(b), that termination would serve Child's best interests.  Mother maintains there was "no direct evidence" as to whether there was a bond between her and Child.  Mother's Brief at 19.  She also challenges the trial court's inference that no bond existed, arguing such an inference ignores "all the evidence of the interactions and relationships" between her and Child.  *Id.*  Mother also avers "there was scant testimony" — and not clear and convincing evidence — about the effect termination would have on Child.  *Id.*  We conclude no relief is due.

Subsection 2511(b) provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has stated:

> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b).  In this context, the court must take into account whether a bond exists between

child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.

When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.

"Above all else…adequate consideration must be given to the needs and welfare of the child." A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child — the love, comfort, security, and closeness — entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his . . . parental duties, to the child's right to have proper parenting and fulfillment of his . . . potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*Id.* at 1120 (citation omitted). Pertinently,

In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case.

*In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

Here, regarding section 2511(b), the trial court reasoned:

Mother has been only minimally compliant with supervised visitation throughout the life of the case. [N.T. at 66, 74-75, 80, 95.] Mother was minimally compliant until October 2020, since when [sic] she missed two weekly visits. [N.T. at 66, 74-75.] Prior to October 2020, Mother was routinely inconsistent and noncompliant. Mother would miss visits, show up late, and fail to confirm visits, without any explanation. [N.T. at 66.] For the life of case, Mother never graduated beyond weekly supervised visits at [DHS] with Child. [N.T. at 67.] Mother's behavior during visitations remained very concerning throughout the case. Unsafe feeding practices and other behavior continued through supervised visits. Mother needed a lot of re-direction in order to keep Child safe. [N.T. at 67.] While Mother shows affection toward Child, she becomes easily upset and irritated if Child cries or screams and [she] is unable to calm Child. [N.T. at 66-67.] Mother and Child needed to be monitored every 15 minutes . . . at Northern and Mother has failed to learn safe parenting practices. The CUA Case Manager believed Mother does not have adequate understanding of Child's developmental needs and so could not move toward unsupervised visits. [N.T. at 67.] The CUA Case Manager noted that Child is "very, very bonded to the foster parent" and becomes upset with Mother because he is not with the people he primarily knows, the foster parents. [N.T. at 67.] The CUA Case Manager testified that Child cannot be safely returned to Mother. [N.T. at 73.] It would be harmful to remove Child from their [sic] current caregiver and return him to Mother. [N.T. at 73.]

Child has been in foster care placement since birth and the trial court found that there is no parental bond between Child and Mother. [N.T. at 67-68, 96-97.] Because there is no apparent or beneficial bond to preserve, it is in Child's best interest to terminate Mother's parental rights and so be freed for adoption. [N.T. at 67-68, 96-97.] Due to Mother's inconsistent participation in supervised visits, Mother has not created a parental bond with Child. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship with Mother. Mother is unable to provide stability to Child and does not have a parental bond with Child. Mother is unable to meet Child's basic needs or provide safety. [N.T. at 67.]

Trial Ct. Op. at 17-18 (paragraph break added).

The competent evidence in the record supports the trial court's determination that termination of Mother's parental rights would serve Child's best interests. The trial court credited Ms. Mills' testimony that Child is "very, very bonded to the foster parent," and Child views her as his parent figure. ***See*** N.T., 1/22/21, at 67, 71. Ms. Mills testified further that Mother does not have an adequate understanding of Child's developmental needs. ***Id.*** at 67. Contrary to Mother's contentions, Dr. Russell and Ms. Mills provided ample testimony in support of their opinions regarding Child's relationship with Mother. This is especially true given Child's young age and the fact that he has spent most of his life in foster care. ***In re Adoption of M.A.B.***, 166 A.3d 434, 449 (Pa. Super. 2017) ("The court should specifically consider that a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

The trial court appropriately considered Child's need for safety and stability and determined that termination of Mother's parental rights best met Child's needs and welfare. After careful review, we find there is competent evidence of record that supports the trial court's decision that termination is appropriate pursuant to section 2511(b). We do not discern an error of law or abuse of discretion.

## IV. Permanency Goal Change to Adoption

We address Mother's final two issues together as they are related. She argues that the trial court erred, with respect to both its goal change and termination decisions because, Mother contends, DHS failed to assist her or make "reasonable efforts" with respect to her intellectual and developmental disabilities. Mother also asserts the trial court "was unsympathetic . . . to providing [her] with any more 'ample time and opportunity;'" she reasons that the "mere passage of time — without reasonable efforts . . . to assist [her] — cannot suffice." Mother's Brief at 25. For example, with respect to her visits with Child, Mother avers there was "no indication that she was offered any assistance in keeping organized, keeping a calendar, and managing her affairs." *Id.* at 27. Finally, Mother claims she was denied a full opportunity at the termination hearing to cross examine Dr. Russell, who had performed the "Parenting Capacity Evaluation." *Id.* at 26. Mother points out Dr. Russell's testimony, "I think the biggest issue there is finding [Mother] help." *Id.* We conclude no relief is due.

We address these issues mindful of the following.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

Moreover, we have stated:

- 21 -

It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*Interest of D.P.*, 972 A.2d 1221, 1225 (Pa. Super. 2009) (citation omitted).

Further, we have instructed:

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations omitted).

As stated above,

"[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."

*In re Adoption of R.J.S.*, 901 A.2d at 513.

In its opinion, the trial court found DHS and CUA made reasonable efforts to reunify Mother and Child and assist Mother with her developmental and disability needs:

. . . . DHS and CUA have indeed made reasonable efforts in this case. The docket reflects that the trial court found reasonable efforts were made in this case from March 4, 2019, up until the termination on January 22, 2021. At the termination trial [in] January 2021, Child had been in placement since birth for twenty-two months. [N.T. at 96-97.] The docket reflects that Mother had been ordered and the CUA Case Manager made the necessary referrals for ARC services, dual diagnosis assessment, supervised visits, and assisted Mother with mental health.

The CUA Case Manager had been working with Mother and Child for the life of the case. [N.T. at 46.] Mother had originally been committed to DHS on her own, as a minor, [in] September 2018, prior to the birth of Child. [N.T. at 48.] The CUA Case Manager testified that when Mother turned 18, her commitment was discharged due to Mother often being AWOL from placement and refusing services. [N.T. at 48-49.] After Mother's discharge, she still refused services while in a mother-baby program at Northern and was "302"[5] due to erratic behavior, which as the CUA Case Manager testified, was one of the reasons the OPC for Child was initially obtained. [N.T. at 49.]The CUA Case Manager testified that Mother AWOL'd from multiple facilities after being 302 [sic]. [N.T. at 52-53.]

Mother was informed that after age 18, she could continue under DHS care through a board extension but [she] refused as "there was too many rules and regulations." [N.T. at 53.] The CUA Case Manager, despite Mother's inconsistency, would do video calls, phone calls, and in-person visits. The CUA Case Manager would provide resources for Mother, by highlighting bullet points, and giving verbal explanations of expectations to her. The CUA Case Manager would check-in with Mother's therapist monthly to check on Mother's attendance. [N.T. at 54.] Mother would tell the CUA Case Manager she was consistent in attending her weekly therapy, but the therapist indicated otherwise. [N.T. at 55-56.] When the CUA Case Manager discussed improving attendance in therapy and potential barriers

_____

[5] *See* Mental Health Procedures Act (Act), 50 P.S. §§ 7101-7503. *See also* 50 P.S. § 7302 (regarding involuntary emergency examination and treatment authorized by a physician.)

or assistance Mother may need to do so, Mother would argue she did not need therapy. [N.T. at 55-56.]

Mother was also recommended for targeted case management, a higher level of case management, which she began but did not complete due to inconsistency and noncompliance. [N.T. at 57.] The CUA Case Manager testified she had worked with the [A]gency's Community Behavioral Health representative regarding intellectual disability services Mother could receive upon turning 18 years old. Mother refused these services, arguing she "was tired of people putting things in her head that didn't belong there" and people were "trying to call her slow", which Mother believed was incorrect. [N.T. at 59-60.]

Testimony indicated that in order to receive intellectual disability services, Mother needed an original birth certificate, so the CUA Case Manager obtained one for [her. N.T. at 60.] Mother still needed her Social Security card, and so the CUA Case Manager connected Mother with the Homeless Advocacy Project and with the Achieving Independence Center ("AIC"), both of whom have been attempting to help Mother obtain her Social Security card for a full year. [N.T. at 60-61.] They also applied for Social Security disability benefits on behalf of Mother, but the application was denied based on Mother's inconsistency in mental health treatment. An application was resubmitted. [N.T. at 60-61.]

Along with refusal or inconsistency and noncompliance with mental health services, Mother also refused housing services. In the six months preceding the January 2021 termination, Mother had three different addresses on record. [N.T. at 61.] The CUA Case Manager and AIC discussed with Mother multiple times the possibility of DHS reentry through Act 91 and stabilizing her housing in this manner, but Mother consistently rejects viable options. [N.T. at 62-63.] The CUA Case Manager also testified that [DHS] was unable to help Mother submit a PHMC [Public Health Management Corporation] housing grant application unless Mother had suitable employment. Mother did not obtain employment until December 2020. [N.T. at 78-79.] Mother was also noncompliant with the parenting program. [N.T. at 65.] Despite ARC services performing extensive outreach to Mother, she did not complete her parenting program. [N.T. at 65.] Mother was also noncompliant and inconsistent with visitation services. The CUA Case Manager testified to popping in on supervised visits

if Mother showed up; however, Mother was inconsistent and would "show up late or she wouldn't confirm at all." [N.T. at 51, 66.]

Mother was offered services for the life of this case, and prior to Child's birth, but refused services or was noncompliant and inconsistent. Mother's assertion of lack of reasonable efforts by DHS and the CUA Case Manager lacks merit both factually and based on the case law of this Commonwealth.

Trial Ct. Op. at 19-20 (paragraphs breaks added).

The trial court also credited Dr. Russell's testimony with respect to providing additional services to Mother:

[She has a] rather immature appreciation for the fact that she has some problems that need to be addressed.

She tends to minimize and pretend that she has no problems, and that she really doesn't have a mood disorder, and that she can get herself along okay, that she can provide adequate care and safety for her child.

. . . I think the biggest issue there is finding [Mother] help in addressing and understanding that she does have problems, and that they do require ongoing, long-term support in order for her to develop the ability to provide an environment that would be safe.

*See* N.T., 1/22/21, at 24-25.

Ms. Mills recounted an extensive history of Mother's refusal to consistently cooperate with services. Ms. Mills indicated that Mother was often dishonest regarding her compliance with services. N.T., 1/22/21, at 56. Ms. Mills testified at length to the programs and services that were offered to Mother, and Mother's repeated noncompliance. *Id.* at 51, 62-63, 65-66. Notably, at the termination hearing, when asked if Mother would like more intensive therapy services, Mother responded, "[T]o be honest, I really feel

like I don't really need it because I don't have issues like how I had before [when I was a minor]." **Id.** at 91.

After a careful review, we conclude the record supports the trial court's determinations. The record demonstrates that Mother was not able to provide appropriate parental care or control for Child at the time of the goal change order, and that it would be in Child's best interest to be adopted by his foster parent. Thus, the trial court did not abuse its discretion or err as a matter of law in concluding that Child's life should not remain on hold indefinitely and determining that a goal change to adoption would be in his best interest. **See In re Adoption of R.J.S.**, 901 A.2d at 513. **See also T.S.M.**, 71 A.3d 251, 269 (Pa. 2013) (stressing the need to expedite the placement of dependent children "in permanent, safe, stable, and loving homes").

Accordingly, as we find that the trial court did not commit an error of law or an abuse of discretion in terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), we affirm the termination decree, as well as the order changing Child's permanent placement goal to adoption.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/6/2021